**PERMIAN BASIN COMMUNITY CENTERS FOR MENTAL HEALTH AND MENTAL RETARDATION, Appellant,**

v.

**Bob JOHNS, Appellee.**

**No. 08–95–00298–CV.**

Court of Appeals of Texas, El Paso.

July 31, 1997.

Dan Ballard, Joanne Summerhays, Clark, Thomas & Winters, Austin, for appellant.

Eva Marie Leahey, Leahey Law Offices, P.C., Odessa, for appellee.

Before LARSEN, McCLURE and CHEW, JJ.

## OPINION

LARSEN, Justice.

In this whistleblower suit, defendant/appellant Permian Basin Community Centers for Mental Health and Mental Retardation ("PBCC" or "the Center") appeals from an adverse judgment following jury trial. PBCC's appeal urges that the evidence established as a matter of law that plaintiff/appellee Bob Johns was not a public employee protected by the Whistleblower Act; that Johns failed to file suit within the period required by the Act; that Johns did not exhaust administrative grievance procedures as required by the Act; and that the trial court made several erroneous decisions during trial. Finding that Johns failed to establish he had met the jurisdictional prerequisite of exhausting the administrative grievance procedure, we reverse.

## FACTS

On April 3, 1992, Bob Johns filed suit against PBCC under the Texas Whistleblower Act, then TEX.REV.CIV.STAT.ANN. art. 6252–16a, now TEX.GOV'T CODE ANN. § 554.001 (Vernon 1994 and Supp.1997). That Act prohibits a state agency or local government from suspending, terminating, or otherwise discriminating against a public employee who in good faith reports a violation of law to an appropriate law enforcement agency. TEX. GOV'T CODE ANN. § 554.002. Johns claimed he had lost his job as a community living instructor with PBCC for reporting an incident of abuse. The Center denied any retaliation, and also claimed that Johns was not a Center employee, had failed to exhaust administrative remedies, and failed to timely file suit.

Permian Basin Community Centers is a governmental unit; its function is to provide support services for mentally disabled Texans in the Midland/Odessa area. Bob Johns was hired by PBCC as a community living instructor in January 1989. After Johns had been working at the Eisenhower group home for about two months, PBCC entered into a contract for management of several of its group homes with Dean Williams, owner of a company called Health Care Management Services. When Williams took over management of the Eisenhower house, all PBCC employees there, including Johns, were transferred to Williams' payroll. In February 1991, Johns was transferred to another group home managed by Williams, the "L" Street house.

On November 4, 1991, Johns found bruises on the buttocks of one of the "L" Street residents, an autistic eleven-year-old. Johns was at first not alarmed by this, as the child was active and frequently bruised himself. Johns made a note of the injury, however, and reported it to his supervisor. Following an internal investigation, another member of the "L" Street staff admitted having hit the child with a belt. The child had other unexplained bruises, however, and on November 7, the PBCC investigator told Johns that the scope of the investigation had expanded. Johns understood this to mean he was now a target also.

On November 7, 1991, Johns called the Texas Department of Human Services to report possible abuse of the resident in the "L" Street home. Meanwhile, Dean Williams, the purported manager of the "L" Street house, had requested of the operations director of PBCC that the autistic child be placed in another home. PBCC refused to allow the alternative placement, and instead required that an entirely new staff be brought in. Williams and the staff protested, concerned that such an abrupt change would upset the residents, all of whom had behavioral problems and required a stable routine. PBCC refused to change its requirement that everyone at "L" Street be replaced, so at 11 p.m. on November 7, Johns, Williams, and the other staff left the "L" Street house in the hands of new staff.

On Friday, November 8, Johns reported for his regular shift at the "L" Street house. That evening, however, Williams arrived at the home with a letter from Clyde McLean, a PBCC director, instructing that Johns and another worker (the one who had confessed to striking the resident with a belt) be suspended until an abuse investigation was completed. The letter read:

> Dear Mr. Williams:
>
> Please be advised that your employees, Bob Johns and Dwight Anders, have been accused of client abuse. As a result of the allegation, I am instructing you that Bob Johns and Dwight Anders are not to work with the Permian Basin Community Centers' clients, or in any Permian Basin Community Centers MR residential home, effective immediately, until such time as the investigation has been completed and a determination made.

Johns' exact work status following this letter is unclear. What is clear is that he never returned to work at PBCC, or for Dean Williams, after November 8, 1991. He was cleared of the abuse allegations by November 14, but no one informed him that he had been absolved.

In December, Johns called the PBCC investigator inquiring about the outcome of the investigation and when he could expect reinstatement. The investigator told Johns she

would see what she could find out. On January 7, PBCC finally informed Johns by letter that he had been cleared of the client abuse charge. Johns then submitted an employment application to PBCC; he testified he was confused and did not understand why he was not reassigned to a group home. Johns received another PBCC letter officially informing him he had been cleared of abuse allegations and that he was now eligible for any open position with PBCC. He reapplied, but was never rehired by PBCC. He filed this lawsuit on April 3, 1992. His lawsuit alleged that PBCC had retaliated against him for reporting alleged abuse to DHS in violation of the Texas Whistleblower Act.

Following trial, a jury found that Johns was the subject of retaliation by the Center, that he was the Center's employee, and that he should receive $47,875 in damages and attorney's fees. This appeal follows.

### Was Johns a Public Employee?

■ In its first point of error, PBCC claims that it established as a matter of law that it did not employ Johns, and he was therefore not protected by the Whistleblower Act from any action taken by PBCC. This question was submitted to the jury, which answered, favorably to Johns, that he was an employee of PBCC MHMR when he called the Department of Human Services about a possible abuse situation on November 7, 1991. The trial court instructed the jury that an "employee" is:

> [A] person who performs services for compensation under a written or oral contract, express or implied, whereby the employer has the right to direct the means or details of the work and not merely the result to be accomplished.

Under the Act, a "public employee" is defined as:

> [A] person who performs services for compensation under a written or oral contract for a state or local governmental body. The term does not include an independent contractor. TEX.REV.CIV.STAT. ANN. art. 6252–16a, § 1(3).[1]

PBCC's argument under this point is twofold: first it urges that because there was no written contract between Johns and the Center, there could be no employment relationship, and second it urges that Johns' theory of employment is one of borrowed servant, which was rejected in *Alaniz v. Galena Park Indep. Sch. Dist.*, 833 S.W.2d 204 (Tex. App.—Houston [14th Dist.] 1992, no writ). Johns' testimony upon which the Center relies in making this first argument was:

Q: ... I am just asking whether you, during 1991, had any type of written or oral contract with MHMR about employment?

A: Just my application with MHMR in personnel.

Q: Was that a contract?

A: It is a form. Do you mean—Mr. Ballard, I have never signed a contract for employment.

The lack of an express employment contract, however, is not fatal to Johns' protected status under the Whistleblower Act. The at-will employment relationship is a contractual one, albeit one for an indefinite period of time. The Texas Supreme Court has held that at-will employees are included within the definition of public employees. *See Winters v. Houston Chronicle Publishing Co.*, 795 S.W.2d 723, 724 (Tex.1990)(the Act is one of several legislative restrictions upon the at-will doctrine); *Knowlton v. Greenwood Indep. Sch. Dist.*, 957 F.2d 1172, 1180–81 (5th Cir.1992)(at-will employees are included under Whistleblower Act). Johns cannot be excluded from the Act's protection on this theory.

■ Next, PBCC argues that there was no employment relationship between the Center and Johns because he was an employee of Health Care Management Services, a private company owned and operated by Dean Williams, which was an independent contractor operating the Permian Basin group homes. In a related argument, PBCC claims that Johns was required to prove that his compensation was paid by the State. Citing

---

1. The Whistleblower Act has been recodified without relevant substantive change, and is now found at TEX.GOV'T CODE ANN. § 554.001, et seq.

*Alaniz,* PBCC claims Johns cannot seek redress under the whistleblower statute as a matter of law. We find this case is distinguishable.

■ In *Alaniz,* plaintiff worked for Servicemaster, a company providing custodial services to defendant school district. He was fired for insubordination in reporting thefts from school vending machines to the school administration, instead of to his Servicemaster supervisor. Rejecting plaintiff's argument that he was a borrowed servant of the school district and therefore entitled to whistleblower protection, the court held:

> [W]e believe the borrowed servant principle is ... inapplicable because Servicemaster had the primary right to control and supervise appellant's custodial duties besides the responsibility to hire, pay wages, withhold social security and taxes, and discharge the appellant. *Alaniz,* 833 S.W.2d at 207.

Here, although the contract between Dean Williams and PBCC stated that Williams was an independent contractor,[2] that alone is not dispositive of Johns' employment status with PBCC. Whether one is an independent contractor or an employee is measured by the amount of control the employer exerts (or has the right to exert) over the details of the work performed. *Newspapers, Inc. v. Love,* 380 S.W.2d 582, 591· (Tex.1964); *Duran v. Furr's Supermarkets, Inc.,* 921 S.W.2d 778, 786 (Tex.App.—El Paso 1996, writ denied). This control extends to decisions concerning personnel and staffing. Here, the employees hired by PBCC were all transferred to Williams' payroll when he took over the PBCC homes. Williams testified that he did not believe a true employer-employee relationship existed between himself and the group home staff he supervised. He refused

to sign an affidavit to that effect prepared for him by PBCC's attorneys.[3] Rather, PBCC required that Williams select his staff from a pool of employees hired by PBCC. PBCC's personnel manual governed his staff's conduct; Williams' staff was subject to assignment to other PBCC group homes when needed, and when assigned to duty in other homes, the employees were paid directly by PBCC. Williams' employee evaluations were subject to review and modification by PBCC, and on at least one occasion, PBCC required Williams to change Johns' evaluation. Williams could not unilaterally hire or fire employees, but needed PBCC's approval before taking action. Although Williams acted as Johns' immediate supervisor, a PBCC employee also acted as supervisor of the group home and was directly involved in housekeeping, menu planning, resident activities, scheduling, and other day-to-day operations. Further, the Williams–PBCC contract set specific salaries to be paid all staff members, set the number of hours to be worked, and required that Williams' time sheets be submitted to PBCC. Finally, it was PBCC's decision to suspend Johns pending investigation of the abuse charges, and to entirely replace the "L" street staff pending investigation, over Williams' protests that this would be detrimental to residents.

We conclude there was evidence from which a jury could reasonably conclude that although Johns was paid through Williams' company, PBCC was actually Johns' employer. PBCC retained the right to evaluation performance, hire and fire, set hours and salaries, define work assignments, and supervise the day-to-day functioning of the group home. In this case, the contrary evidence did no more than create a fact question for

2. The contract read: "It is expressly agreed that the Contractor is an independent Contractor and not an employee of the Board and has no authority to act for or in behalf of the Board to any Contract or in any other manner without the express approval in writing from the Board."

3. The affidavit Williams refused to sign stated, in relevant part: "In conformity with the terms of the contract [between Williams and PBCC] I hired my own employees to provide the services I had agreed to provide. Bob Johns was hired by

me as my employee. His pay scale was set by me and was paid by me out of my own operating account. Bob Johns was not an employee of Permian Basin Community Centers for MHMR. Bob Johns' employment by me was terminated by me because of the termination of my contract with Permian Basin Community Centers for MHMR. My temporary suspension of Bob Johns' employment in November, 1991 was due to the fact that he was being investigated for client abuse."

jury resolution. PBCC's first point of error is overruled.

### Exhaustion of Administrative Remedies

■ In its third point of error, PBCC claims that Johns failed to exhaust the internal grievance procedure available to Center employees. Before examining the evidence presented at trial on this issue, however, we must make a preliminary determination. Under the Whistleblower Act, is exhaustion of remedies a jurisdictional prerequisite to filing suit for which plaintiff bears the burden of proof, or is failure to exhaust the grievance process an affirmative defense for which defendant bears the burden of proof? We conclude that exhaustion of remedies is a prerequisite to suit, on which plaintiff bore the burden of proof.

■ The Whistleblower Act requires that:

> Before bringing an action under this Section, an employee of a local governmental body must exhaust any applicable grievance or appeal procedures adopted by the employing local governmental body to resolve disputes concerning the suspension or termination of an employee's employment or an allegation of unlawful discrimination. TEX.REV.CIV.STAT.ANN. art. 6252–16a, § 3(d).

When a plaintiff brings suit based solely on a statutory cause of action, he or she must comply with all statutory prerequisites, which are mandatory and exclusive. *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 485 (Tex.1991); *Gregg County v. Farrar*, 933 S.W.2d 769, 777 (Tex.App.—Austin 1996, no writ). Where plaintiff fails to comply with statutory requirements before filing suit, the court lacks jurisdiction. *Farrar*, 933 S.W.2d at 777. Moreover, when a statute requires preliminary administrative action before a plaintiff may file suit, the plaintiff also bears the burden of showing that the prerequisite to suit has been met. *Rodriguez v. Am. Gen. Fire & Cas. Co.*, 788 S.W.2d 583, 585 (Tex.App.—El Paso 1990, writ denied); *Methodist Hospitals of Dallas v. Texas Workers' Compensation Comm'n*, 874 S.W.2d 144, 149 (Tex.App.—Austin 1994, no writ). In a recent whistleblower case, the Austin Court of Appeals has held that exhaustion of remedies is a prerequisite to filing suit, and failure to exhaust deprived the court of jurisdiction. *Farrar*, 933 S.W.2d at 777. We agree. The statutory language clearly requires exhaustion of grievance and appeal procedures before filing suit. This, combined with the Act's dual purpose of protecting public employees who report unlawful activities and discouraging unlawful activity by governmental agencies, leads us to the conclusion that a governmental agency must be given the opportunity to address errors and resolve disputes before being subjected to a lawsuit. *Farrar*, 933 S.W.2d at 775; *see also* House Research Organization, Bill Analysis, Tex. H.B. 1405, 71st Leg., R.S. (1989).

We thus conclude that, as with other statutory schemes requiring exhaustion of administrative remedies, the Whistleblower Act requires compliance with an existing grievance procedure before a plaintiff may invoke the court's jurisdiction. *Farrar*, 933 S.W.2d at 777; *see also EZ Pawn Corp. v. Gonzalez*, 921 S.W.2d 320, 324 (Tex.App.—Corpus Christi 1996, writ denied)(to invoke a trial court's jurisdiction under the Texas Human Rights Act, complaining party must first present the claim to the TCHR); *Harris County Appraisal Dist. v. Dincans*, 882 S.W.2d 75, 77–78 (Tex.App.—Houston [14th Dist.] 1994, writ denied)(trial court has no jurisdiction where plaintiff fails to exhaust administrative remedy in statutory scheme); *Barrientos v. Ysleta Indep. Sch. Dist.*, 881 S.W.2d 159, 160 (Tex.App.—El Paso 1994, no writ)(teacher must appeal to administrative authorities before bringing suit for termination). It follows that the burden was on plaintiff Johns to demonstrate that he met the statutory prerequisites necessary to invoke the court's jurisdiction.

■ Although PBCC affirmatively pleaded that Johns' suit was barred because he failed to exhaust grievance procedures, no jury question was submitted on this issue. Thus, we must review the evidence to determine whether plaintiff's evidence eliminated the need for a jury finding on the issue, by conclusively proving either that there was no grievance procedure, or if there was a procedure in place, that he complied with it. After

examining the record, we have determined that fact questions existed which required plaintiff to obtain a jury finding on the issue.[4]

The parties stipulated that when Johns reported abuse to DHS on November 7, 1991, PBCC had a grievance or appeal procedure to resolve disputes concerning suspension or termination of an employee. It was also stipulated that PBCC was a local governmental entity within the meaning of the grievance requirement. There was evidence that PBCC had a formal written grievance procedure, with several specific steps, at least one of which required that an aggrieved employee submit a complaint in writing.[5] Johns testified that before March 1992, when he realized he would not be reinstated in his job, he made several calls to PBCC inquiring about his employment status and the progress of the investigation. There was no evidence, however, that Johns invoked the grievance procedure after the March 1992 date, nor that he ever made a complaint in writing. Even viewing this evidence in the light most favorable to the verdict, we cannot find that it conclusively establishes compliance with the grievance procedure such that a jury finding on the issue was unnecessary. For this reason, we conclude that the trial court had no jurisdiction over this case. We sustain PBCC's Point of Error Three.

### CONCLUSION

Because of our resolution of Point of Error Three, we need not address PBCC's remaining points. We reverse the judgment favoring plaintiff Johns, and remand to the trial court with orders to dismiss the case for lack of jurisdiction.

---

4. Interestingly, defendant requested a jury question on this issue, which the trial court declined to submit. PBCC's request that the issue be submitted precludes a deemed finding in support of the judgment. *See* Tex.R.Civ.P. 279.

5. The procedure provides that: 1) an aggrieved employee verbally complain to an immediate supervisor or the Executive Director; 2) if there is no resolution at that level, submit the grievance in writing to the board of trustees; 3) a grievance committee composed of the personnel committee of the board of trustees and the executive director holds a hearing within five days after receipt of the grievance by the committee; 4) the committee makes recommendations to the board of trustees; and 5) the board's decision is final.